2ʹ

United States District Court
Southern District of Texas
FILED

NOV 0 9 2001

Michael N. Milby
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

JON ALAN ASHCRAFT,     *
       Petitioner     *
     *
     *     MISC. NO. B-98-031
     *
V.      *
     *
JANIE COCKRELL, DIRECTOR     *
TEXAS DEPARTMENT OF     *
CRIMINAL JUSTICE,     *
INSTITUTIONAL DIVISION,     *
       Respondent.     *
     *

## PETITIONER'S ANSWER TO RESPONDENT'S MOTION
## FOR SUMMARY JUDGEMENT WITH BRIEF IN SUPPORT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Jon Alan Ashcraft, Petitioner Pro Se, hereinafter "Petitioner" who now presents this "Petitioner's Answer To Respondent's Motion For Summary Judgement With Brief In Support".

Therefore, Petitioner respectfully requests this Court consider this motion with the liberal scrutiny in keeping with the proviso enunciated in **Haines v. Kerner,** 404 U.S. 519, 92 SCt. 594 (1971), rather than considering this matter under the stringent standards applied to pleadings drafted by skilled counsel.  In support thereof Petitioner as non-movant would show the Court the following:

1.

2

# I.

## JURISDICTION

Jurisdiction is conferred upon this Court pursuant Fed. Rules of Civil Procedure #56 and 28 U.S.C. §§ 2241, 2242 & 2254.

# II.

## JUDICIAL NOTICE BY THE COURT

Petitioner requests this Honorable Court take **Judicial Notice** on three points: (1) Respondent invokes summary judgement jurisdiction under 28 U.S.C. § 2241, 2254. Under neither statute for Habeas Corpus jurisdiction is there found as well jurisdiction to invoke summary Judgement. The FRCP # 56 is the jurisdiction to invoke summary judgement. (2) Respondent failed to answer by responsive pleadings in the time limits established by the Court. Although Respondent sought further extension of time it was not granted therefore Respondent's pleadings was due September 22, 2001 not October 22, 2001. Under **Bisset v. Burlington Northern R.R.Co.**, 969 F2d 727, @ 731 (CA 8 1992) it was held a "failure to plead affirmative defense results in waiver of the defense and its exclusion from the case."

Similarly, support from FRCP #8 concurs:

> "Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading."

Thus, because Respondent has failed to file a timely responsive defense to Petitioner's Habeas Corpus relief

3

sought.  Respondent has essentially waived this summary

judgement motion as not proving timely on the one hand, and,

failing to invoke the proper jurisdiction is fatal for

learned counsel representing Respondent.

Further, the United States Supreme Court has

demonstrated from **Bell v. Hood**, 327 U.S. 678, 66 S.Ct.773,

90 LEd 939 (1946) that,

> ", the party that brings the suit is master
> to decide what law he will rely upon, & * * *
> (Constitution or laws) of the United States by
> his declaration of bill."

Id. @ 681, 66 S.Ct. @ 775.  Petitioner established Habeas

Corpus jurisdiction with the initial filing of this matter.

In turn, Respondent has requested summary judgement relief

without invocation of the proper jurisdiction under FRC #56.

The U.S. Supreme Court undeniably contends from **FW/PBS,**

**Inc. v. City of Dallas**, 493 U.S. 215, 110 S.Ct. 596, 107 LEd

603 (1990) that:

> ".... it is the burden of the 'party who seeks
> the exercise of jurisdiction in his favor,
> (Citations Omitted) clearly to allege facts
> demonstration that he is the proper party to
> invoke judicial resolution of the dispute.
> (Citations Omitted) Thus, petitioners in this
> case must allege ... facts essential to show
> jurisdiction, If [they] fai[1] to make the
> necessary allegations; [they have] no standing.

Cf. **McNutt v. Gen. Motors Acceptance Corp.**, 295 U.S. 178.189

56 S.Ct. 780, 785, 80 LEd 1135 (1936).  Respondent has

titled his pleading as a motion for summary judgement does

not establish jurisdiction for summary judgement.  The

actual statute relied upon must be stated  or as stated

above from **FW/PBD., Inc. v. City of Dallas** the party has no

standing lacking proper jurisdiction.

4

Hence, once Petitioner has met the burden and established jurisdiction over Respondent by making a prima face showing of the facts there is no need to pursue the facts further. **Wilson v. Belin,** 20 F3d 644 @ 648 (CA 5 1994). The Court must accept uncontroverted allegations in pleadings and resolve factual disputes emerging ... in favor of Petitioner. **D.J. Investments v. Metzler Motorcycle Tire Agent Gregg, Inc.,** 754 F2d 542, 546 (CA 5 1985); **Amoco Chemical Co. v. Texas Tin Corp.,** 925 F.S. 1192, @ 1199 (SD Tx 1996.)

(3) Petitioner is severely handicapped in his access to courts in his very limited law library time allowed him. Also, that the law library available to Petitioner is extremely limited in access to the books available which results in an impediment to Petitioner's research in such a short time and that all TDCJ-ID law libraries lack on hand Sheppards citations to Federal, State and Supreme Court law.

On the preceding context Petitioner humbly asks this Court to take **Judicial Notice**.

### III.

### SUMMARY JUDGEMENT STANDARD OF REVIEW

Although Respondent has requested a summary judgement without outlining summary judgement jurisdiction. Petitioner is sure the Court will allow Respondent certain leeway that is not entitled to Respondent and, in fact, fatal to the motion for summary judgement.

The United States Supreme Court held regarding summary judgement decisions in **Anderson v. Libberty Lobby Inc.,** 477

5

U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 LEd2d 202 (1986),

that "...in considering a motion for summary judgement, the

Court will not "weigh the evidence and determine the truth

of the matter." "Instead, the Court is to draw any

permissible inference from the underlying facts" in the

light most favorable to the non-moving party." **Matushita**

**Electronic Ind. Co., Ltd. v. Zenith Radio Corp.**, 475

U.S. 574, 587-88, 106 S.Ct. 1348, 1356-57, 89 LEd2d 538

(1986).  Further, the Supreme Court expands in **Eastland**

**Kodak v. Image Technical Services**, 504 U.S. 451, 112 S.Ct.

2072, 119 LEd2d 256 (1992)

> "...the evidence of the nonmovant is to be
> belived and all justifiable inferences are
> drawn in favor of the nonmovant."

(Quoting **Anderson v. Liberty Lobby, Inc.**, supra @ 255, 106

S.Ct. @ 2513)

## IV.

### STATEMENT OF THE CASE

Petitioner avers that facts presented as background to

the underlying case are muddled, unconstrued and maligned

particularly to mislead the Honorable Court.

Hence, Petitioner's recitation of the case history and

facts are as follows:

## A.  Procedural History

As succinctly as possible use factual procedures unto

filing Federal Habeas Corpus § 2254.

6

## B. Factual History

1. Petitioner was approached on June 23, 1991 by Augustine Pena and Juanita Torres requesting to borrow ($20) twenty dollars.

2. Petitioner and the couple engaged in a conversation for approximately (20) minutes when Augustine Pena asked if he could borrow the money.

3. Approximately two hours later Officer Mitchel in a marked police car pulled in Petitioner's driveway and spoke with Petitioner about a car parked in the driveway. After, being told the car belonged to a friend who was in the hospital after just having a baby the officer left.

4. Approximately two hours after that two men arrived in a white pickup. They approached Petitioner's back door. Petitioner came out and they alleged they were police officers and arrested Petitioner.

5. The police alleged to have a search warrant to search Petitioner's house. When Petitioner asked to see this alleged search warrant Petitioner was shown a one page sheet of paper titled search warrant. No where on this one sheet of paper was the Petitioner's name, address and/or things to be searched. There was no attached affidavit.

6. Petitioner instructed the police to take off the handcuffs and to leave his house because the piece of paper he was shown was not a valid search warrant to search his house. He asked the police where it had his address or even his name on it. At no time did Petitioner and/or his mother consent or give the police permission to enter and/or search the house.

7. When the police realized that the search warrant did not have the name of petitioner on it nor did it have his address and did not list anything to be searched they became belligerent, Detective Araiza told Petitioner "If you do not take us in the house and show us drugs and stolen property we are going in the house and arrest your mother and take everything in the house."

8. After the threats were made several times a search took place. Every time Petitioner would refuse to cooperate with the search, the words to the effect were stated and restated, "you are not cooperating, we are going to arrest your mother!" Both Detective Araiza and Detective Ramon Vela made these repeated

7

threats to arrest Petitioner's mother if Petitioner
did not cooperate to whatever police wanted.
Fearing his mother my have an asthma attack
and or heart attack Petitioner did what police said.

9. Police while searching Petitioner's room would grab
handfuls numerous household items. A number of
times  Petitioner asked police to leave items alone
that had belonged to his dead grandmother and dead
brother and the police would just throw them on the
floor and take them anyway. Police rummaged through
Petitioner's room and had no list of items that they
were looking for.

10. After searching and gathering various household item
the police loaded these items in the back of the
white pickup. At no time was an inventory list of
the items taken ever made. Nor was an inventory
list of the items gathered ever left with Petitioner
and/or his mother before police left as required by
law.

11. Petitioner was transported to the Harlingen Police
Station. Sometime later Petitioner saw the police
bring the items taken from his house brought into
the Detective's office area.  These items were put
in an area that already had some other property in
the room. The items were mixed together.

12. The items were not logged into the evidence room
and it took several days of Petitioner's mother
asking for a list before Detective Byrum made and
brought Petitioner's mother an inventory list.

13. Petitioner asked the police for an attorney and
police laughed and joked that a lawyer could not
help him now and all a lawyer would do would be to
take Petitioner's money.

14. Police then told Petitioner that he had to make a
statement. Petitioner told police that he had just
injected heroin and that his back was hurting and he
needed his codeine medication. Detective Byrum told
Petitioner "if you make a statement I will go get
your codeine medication."

15. Petitioner was concerned about his mother and asked
police if his mother was O.K. Petitioner was under
the impression that police were still at his
mother's  house.

16. Police then told Petitioner a second time that he
had to make a statement. Petitioner asked police a
second time if he could speak to a lawyer.
Detective Aeaiza then told Petitioner that "if you

8

do not make a statement saying you had did all those burglaries in Parkwood he was going to go back to Petitioner's house and arrest his mother."

17. Petitioner fearing for his mother's health and safety began to make a statement. Every time Petitioner's statement did not satisfy Detective Araiza he would threaten to go back and arrest Petitioner's mother. Petitioner made a statement that would satisfy the Detectives. The statement was made under duress and coercion.

18. When Petitioner signed the statement Detective Araiza told him to initial each of the Miranda rights at the top of the statement to show that Petitioner waived these rights. Petitioner did not initial the waiver for the lawyer because Petitioner never waived his right to a lawyer.

19. The next day Petitioner was taken to be arraigned but could hardly walk due to heroin withdrawals and the numerous codeine pills that the police had given him.

20. Upon arriving back to the police station Detective Byrum gave Petitioner more pills. Detective Araiza then told Petitioner that he had to make a second statement so "he could clear all those Parkwood burglaries." Petitioner told Detective Araiza that he did not want to make a statement. Detective Araiza once again told Petitioner "if you do not make statement to clear all these burglaries, I will go back to your house and arrest your mother."

21. Petitioner was loaded in the back seat of Detective Araiza's car. Petitioner was driven all around the neighborhood and asked "did you do that house?" Petitioner was so drugged out from the codeine and feared for his mother that he would say yes or I am not sure. Police then made a list of houses.

22. Some time later Petitioner was given the second statement to sign. Petitioner was drugged up he could not even read the statement. Detective Araiza once again threatened him, "if he did not sign the statement his mother would be arrested." Petitioner under duress and coercion signed the second statement.

Petitioner states the following facts for clarification.

23. No illegal drugs were found at Petitioner's house.

24. Petitioner's house had also been burglarized twice in this time frame that houses in Parkwood were being burglarized.

9

25. When detectives found Augustine Pena and Juanita Torres they had lost sight of them for over 15 minutes and found them at a park in Harlingen known for drug transactions.

26. When police stopped Augustine Pene and Juanita Torres the police told the couple "you just bought drugs from Jon Ashcraft at his house." Thereby, giving the couple the information the police were seeking. Thus, tainting their statements.

27. The couple was told by police "give us a statement that you bought drugs from Jon Ashcraft and we will let you go."

28. The couple had just injected heroin before they gave their statements to police.

29. Juanita Torres testified that her voluntary statement was given under coercion and duress.

30. Petitioner hired Glen Barnard for the two cases he was arrested for drugs and one burglary.

31. When Petitioner realized that Glen Barnard had no intention of defending him, but just wanted Petitioner to sign a plea bargin, Petitioner contacted three other lawyers.

32. The Honorale Abel Limas told Petitioner that he would take his case only after Glen Barnard withdrew from the attorney of record. The trial court would not allow Glen Barnard to withdraw. Therefore denying Petitioner of his right to the retained attorney of his choice.

33. Petitioner was forced to go to trial with an attorney whom there was great conflict and had no intentions to prepare for trial.

34. Petitioner had not paid Glen Barnard his whole fee because he would not do his job.

35. The Court then, at strong objection by Petitioner, appointed Glen Barnard to the other cases, yet, would not allow Mr. Barnard, time to prepare after he was appointed, and/or serve Petitioner a copy of the indictment for the cases as prescribed by law. Barnard was held in contempt of court for failing to appear for pretrial hearing.

The above Factual History is attached as **Exhibit "A"** in an affidavit.

10

**V.**

**MATERIAL ISSUES IN DISPUTE**

**1.  Conflict of Interest**

Although Respondent cites no difference under this
claim, Respondent is mistaken.  The State Bar Rules, Article
10 § 9 (State Bar Rules of Conduct 1991) clarify these
issues.  Because Justice Melchor Chavez and attorney Glen
Barnard were law partners, it was a distinct conflict of
interest for the judge to try to render an opinion on a case
handed down by his former law partner.  The rule holds to
forbid counsels (or, any other firm member thereof),
representation of a client in any litigation where a
fiduciary relationship exists and is subject to conflict of
interest.

The conflict exists based on the mere fact that attorney
Glen Barnard and Justice Melchor Chavez could have parted
company on bad terms.  By the same token, Justice Chavez
decided the case of **Barraza v. State**, 900 SW2d 840 (TexApp-
Corpus Christi 1995).  The affidavit therein presented much
stronger evidence of probable cause than that offered in the
case of Petitioner.  Yet, Justice Chavez decided in Barraza,
that "..there is no corroboration." regarding the
reliability of the informant.

In Petitioner's case neither juanita Torres nor
Augustine Pena were established as informants and shown
to be credible and reliable as law requires.  Furthermore,
their position is highly questionable as informants.  The

11

officers testimony reflects that police knew the couple had recently injected heroin and told the couple the information they were seeking when they stopped them. Police told the couple "you just bought drugs from Jon Ashcraft at his house." Therefore tainting any information the couple would give.

Hence, Respondent proclaims in the summary judgement motion that no facts were alleged on this claim. The issue is very simply stated by the fact two individuals were former law partners and a matter of litigation came before one law partner (a judge) being presented by his former law partner on opposite sides of litigation as a matter of competing loyalties to create a conflict of interest and thereby a biased judicial tribunal. See **Evitts v. Lucey**, 105 S.Ct. 830 (1985); **Aetna Life Ins. Co. v Lavior**, 475 U.S. 813, 828, 106 S.Ct. 1580, @ 1586-88, 89 LEd2d 823 (1986); **Bracey v. Gramley**, 117 S.Ct. 1793, @ 1797-98 (1997).

Petitioner asserts because Respondent has alleged this issue a "bald assertion" lacking in support. Petitioner is confined to prison and thereby unable to accumulate any other evidence beyond that already presented. However, a simple check of County State Bar records will provide proof that attorney Glen Barnard and Justice Melchor Chavez were law partners preceding the decision by Justice Melchor Chavez.

Moreover, under summary judgement standards Petitioner as nonmovant is to be believed in the facts presented. And

12

since those facts refute those offered by Respondent a
material issue of facts remains to require Petitioner to
receive an evidentiary hearing on this issue.

Clearly because these facts have been asserted by
affidavit the facts have been made a vital part of the
record.  Contrary to respondents allegations of "bald
assertion" by Petitioner, the claim asserted by Respondent
at this point is no different from a general denial
unsupported by Respondent.  The record itself substantiates
Petitioner facts as urged on this issue.  Therefore,
Petitioner's claim is not frivolous and shows a genuine
issue of material facts stand hereupon.

## 2.  Fourth Amendment Claim of Illegal Search and Seasure

Respondent offers that **Stone v. Powell,** 425 U.S. 465, 96
S.Ct. 3037 (1076) prohibits a Federal Court from reviewing
Fourth Amendment Claim.  In turn, Petitioner has asserted
and shown by fact and law that the Habeas Corpus  proceeding
which is considered also to be an aspect of litigating an
issue is the portion of the "full and fair opportunity" to
litigate in state court that was denied because no decision
was rendered by the Texas Court of Criminal Appeals.

Further, Petitioner has offered a host of caselaw and
argument from both the Fifth Circuit and the United States
Supreme Court (page 6 Fed. Writ) to support that where Texas
Habeas Corpus has permitted the Texas Court of Criminal
Appeals to "white card" a decision seeking habeas relief
that the process is "clearly deficient" and does not amount

13

to a "requisite consideration of the claims raised in the
state petition to preclude a Federal Court from subsequently
addressing those claims." **Garrett v. McCotter**, 807 F2d 482,
@ 484 (CA 5 1987); also **Graham v. Johnson** 94 F3d 958, @ 969
(CA 5 1996) (quoting **Duckworth v. Serrano**, 454 U.S. 1 @ 3,
102 S.Ct. 18, @ 18, 70 LEd2d 1 (1981).

Clearly, this provides that **Stone v. Powell**, supra, has
an exception which it applies here. The analysis on this
issue offers conflicting subject matter to demonstrate a
genuine issue of material facts and law requiring that
Respondent is denied summary judgement on this issue.

### 3. Unconstitutional Search and Seizure Violates Fourth Amendment

Respondent has consolidated claims #2 and #3 together
under **Stone v. Powell**, supra, limitation to request summary
judgement on this issue. Petitioner asserts this issue is
taken from a different legal perspective while still
relying on a Fourth Amendment Claim, it also hinges on the
same reasoning to overcome the **Stone** limitation being
offered in the preceding response above.

### 4. No Evidence

Respondent asserts the record evidence sufficient to
support the conviction. Instead the fact is no court has
given this issue an evidentiary hearing, therefore on that
basis is why the conviction stands. Hence, Respondent
offers in the Standard for Review section that **Washington
v. Taylor**, 529 U.S. 362, 405, 120 S.Ct. 1495, 1519 (2000)
states the state court decision involves an "unreasonable
application" of Supreme Court law.

14

Although the state is permitted a "presumption of correctness" in its decision that applies only to facts not law. Whereas, Petitioner offers lawful support for any claim establishes the requisite for an evidentiary review of those claims. Under these terms of law a de novo review is required by the federal forum.

By the same token, because Respondent has requested summary judgement relief taken into account the standard from **Jackson v. Virgina**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 LEd2db560 (1979) requires a conviction that has failed proof of <u>every</u> element of the offense is constitutionally infirmed. Id. @ 2786.

There is "no evidence" to support every element of the offense charged; burglary of a habitation. The burden of proof beyond a reasonable doubt therefore cannot be substantiated with insufficient support from the record. The charge of burglary of a habitation has four elements, each standing alone in proof.

The facts from the trial record reveal the nature of a drug transaction, with the conjecture and speculation of drugs sold by Petitioner and used as probable cause based on unreliable informants to yield evidence for an offense Petitioner was never charged with nor was any drugs discovered at Petitioner's residence. Petitioner was charged with burglary of a habitation, but 80 per cent of the trial record pertain to a subjective drug deal that never occurred.

15

The only evidence involving the burglaries came from complainants who declared seeing vehicles resembling Petitioner's parked in the vicinity. Not one complainant witnessed Petitioner in possession of stolen items. Nor were stolen items discovered in Petitioner's vehicle. There were items of stolen property alleged located at Petitioner's residence. However, the detectives broke the chain of custody of the purported stolen items by taking from Petitioner's home without leaving an inventory list, violating a state statute. In turn, any property from Petitioner's home was mixed among contaminated goods already in the Burglary and Theft Division of the Harlingen Police Department.

Thus, not one witness stepped forward to admit witnessing Petitioner enter either residence for which he is charged. Aside from that there is "no evidence" in the record evidence to show Petitioner had been in either burgled residence. Petitioner could have purchased such items as a fence rather than having burgled someone's home. Because there was "no evidence" to show Petitioner entered either habitation, not open to the public this element of the offense charged lacks substantiation.

Hence, any element not proved leaves the offense lacking support beyond a reasonable doubt. By the same token, no record evidence showed Petitioner had the intent to commit a felony or theft. Petitioner's confession to admit such offense was derived under the duress of police authorities

16

threatening to arrest his elderly mother each time he gave a response the interrogating officers did not like or did not fit their reasoning. There was no fact evidence presented in the evidence presented in the record in support of Petitioner having the requisite intent.

Therefore, "no evidence" is available to support either the third or fourth elements of the offense. And a conviction based speculation and presumption does not support the standard announced by **Jackson v. Virgina**, supra, to prove an unreasonable application of Supreme Court law. Where the record evidence is not clear nor specific, it permits "all inferences and facts are drawn favorable to nonmovant." **Liberty Lobby**, supra, @ 248, 106 S.Ct. 2510.

The Supreme Court further commands that any "... conviction resting on [an unconstitutional] presumption cannot be deemed a conviction based on sufficient evidence." **County Court of Ulster Co. v. Allen,** 442 U.S. 140, @ 147, n.5, 99 S.Ct. 2213, @ 2219, 60 LED2d 777 (1979).

Cf. **In re Winship**, 90 S.Ct. 1065 (1970)

> "... .. the reasonable-doubt standard is indispensable for it " impresses on the trier of facts the necessity reaching a subjective statute of certitude of the facts in issue."

Id. @ 1071. The **Winship** standard of "subjective state of certitude of the facts issue," is required for the trier-of-fact. Equally as important, where the record evidence is void of the Winship announced "certitude of the facts" on any element of the offense charged brings into focus the "unreasonable application" embraced by the **Washington v. Taylor**, supra.

17

In turn, the preceding has shown where the record evidence is lacking, a genuine issue of material fact is raised on a "no evidence" claim being in dispute and leaving the record unsettled.  And, "... resolution of disputed material fact is not to be achieved by a judge through summary judgement."  **Liberty Lobby**, supra.  Thus, "a dispute of material facts issues can only be resolved through resort to the finder of facts, in the case, the court."  **Colsten v. Barnhart**, 130 F3d 96, @ 102 (CA 5 1997).

This provides that the state court has failed  to prove each element of the offense charged to warrant summary judgement relief not issue to Respondent.

## 5.  Involuntary Confession

Respondent's concerns hereunder describe that Petitioner made no viable showing of involuntary confession.  However, Respondent is wholly in error.  The record evidence presents the investigating admitted that Petitioner appeared to have recently used drugs.  Petitioner's affidavit states he had injected drugs prior to being arrested and questioned.

There the State has used an "unreasonable application" of Supreme Court law to arrive at a conclusion opposing decision rendered in **Schneckloth v Bustamonte**, 412 U.S. 218. @ 219, 93 S.Ct. 2041, @ 2043, 36 LEd2d 854 (1973), where the court stated an exception to voluntariness occurs, ".. in where a person is unconscious or _drugged_ or otherwise lacks capacity for conscious choice, ..." (emphaisis added)

18

The Supreme Court goes further to tie in a relative fact that certain circumstances demonstrate where law enforcement,

> "... resort to bullying and physical force and torture. If there is a right to an answer there soon seems to be a right to the expected answer-that is, to a confession of guilt."

**Escobeto v. State of Illinois**, 84 S.Ct. 1758 (1964). The record evidence provides the detectives admitted telling Petitioner that his mother would being arrested each time he asked for an attorney or refused to answer in complicity with questioning.

The Supreme Court in **Schneckloth v. Bustamonte**, supra, additionally offer that the use of explicit coercion is obviously in violation of the 4th, 5th & 14th Amendments to the United States Constitution, @ 219, 93 S.Ct @ 2043.

Petitioner never waived his rights without being coerced. Petitioner's mother testified to hearing detectives threaten her son with her arrest. And, Detective Byrum testified that Petitioner's mother was never a suspect of any criminal investigation. The United States Supreme Court from **Schneckloth**, supra, quotes, **Blacburn v. Alabama**, 361 U.S. 190, 80 S.Ct. 274, 4 Led2d 242 to suggest in support, that:

> "[I]n cases involving involving involuntary confession, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government in the course of securing conviction, wrings a confession out of an accused against his will."

19

Undoubtedly, the law enforcement authorities were wrought
with vengeance against Petitioner claiming his name came up
in certain burglaries without evidence in support. The same
detectives made a speculative assertion that Petitioner
dealt drugs without any evidence in support to obtain a
charge or conviction on drugs. Thus, an involuntary
confession was wrung from Petitioner by coercion under
duress. This connotes the Supreme Court holding from
**Bumper v. North Carolina**, 391 U.S. 543, @ 550, 88 S.Ct.
1788, @ 1792, 20 LEd2d 797 (1968) that , "where there is
coercion there <u>cannot</u> he consent."

Once Petitioner requested an attorney and chose to end
further discussion with investigators he was threatened with
the arrest of his mother, creating an atmosphere of duress
and coercion from Petitioner. The Supreme Court has
adamantly held an involuntary confession violates the
constitution and a conviction based thereupon cannot stand.
See **Schneckloth**, supra.

Further Respondent asserts being a presumption of
correctness on this issue, however, that presumption is
nullified on questions of law requiring a de novo review.
Thus, Respondent's assumption of this point is in dispute.
Presumption of correctness rely solely on questions of
facts, not law. Hence, on this rule Respondent has
misconstrued the law to invalid the legal argument assorted
because a "presumption of correctness" deference to a
Supreme Court decision involves fact alone, not legal
questions.

20

In addition, Respondent's argument hereunder only clouds the facts asserted and decided on appeal. This is an entirely different stage from direct appeal. A thorough assessment of Petitioner's Federal Habeas Corpus Claims on this issue with fully clarity all doubt and misguidance prevailing over Respondent.

Because a dispute of both fact and law results here, Petitioner offers that summary Judgement cannot issue based on the presentation of claims by both parties in dispute. This also renders a genuine issue of material fact in question to call for an evidentiary hearing to resolve fact issues and questions of law outlined by each party.

## 6. Sixth Amendment Right To Counsel, Denied

Respondent's motion for summary judgement should fail on this point. Respondent has misconstrued the issue at hand. Petitioner had hired Glen Barnard to represent him on two cases he was arrested for, drugs and burglary. Because there were no drugs found at Petitioner's house he was not indicted on such a charge. But later had numerous other indictments (six) for burglaries. Glen Barnard Petitioner's retained counsel for the one burglary attempted to coerce Petitioner to take a plea bargain to all six cases. Petitioner repeatedly tried to get Mr. Barnard to investigate the case he had been hired for but Mr. Barnard would not. Petitioner was in contact with the Honorable Abil Limas to take over the trial of the lead case and others if necessary. Mr. Limas told Petitioner that before he could take the case Mr. Barnard would have to withdraw.

21

Mr. Limas would be ready to take on the case without delay.
The first available time to address this issue was the first
appearance for the pretrial motion to withdraw.  The court
erred by not allowing Mr. Barnard to withdraw and allowing
Mr. Limas, Petitioner's counsel of choice, to represent him.

The Sixth Amendment guarantees the assistance of counsel
in all criminal proceedings U.S. Const. Amend VI.  That
guarantee has long been construed to include a criminals
defendant's qualified right to retain counsel of the
defendant's own choosing. **U.S. v. Hughey**, 147 F3d 423, @ 428
(5th Cir 1998).  Constituent with that guarantee is a right
to hire an attorney of his choice" **U.S. v. Izydore**, 167 F3d
213@228 (5th Cir 1999) (Quoting **Morris v Slappy**,
461 U.S.1, 103 S.Ct. 1610, 75 LEd2d 610 (1983))

Respondent then goes way off course in his
interpretation of Petitioner wanting to appear pro se.
Petitioner after the first trial went to have Mr. Barnard
removed as counsel for appeal because there was a conflict
of interest and Petitioner was going to raise the issue of
ineffective assistance of counsel on appeal.  The court
chose to use the hearing to find Petitioner indigent and
maliciously appointed Mr. Barnard to the other remaining (6)
six cases.  The next court appearance two days later
Mr. Barnard did not even appear and was held in contempt of
court.  It was apparent that Mr. Barnard had no intentions
of preparing for trial because he did not even bother to
show up.  When he did show up three days later he still
had not prepared for Petitioner's trial.

22

In **Delgado v. Lewis,** 223 F3d 976, @ 980 (5th Cir 2000)
the court held: "[t]he Sixth Amendment right to counsel, of
course, guarantees more than a warm body to stand next to
the accused during critical stages of proceedings; an
accused is entitled to an attorney who plays a role
necessary to ensure that the proceedings are fair."
Mr. Barnard's failure to even show up for court did not even
provide Petitioner a warm body. Surly the trial court
should have seen the problem that counsel did not want to
assist Petitioner. Yet, the trial court forced Petitioner
to trial with an unwilling and unprepared attorney, a
violation of Petitioner's Sixth Amendment right. In fact,
Mr. Barnard was later found by the Texas Court of Criminal
Appeals to have been ineffective counsel in guaranteeing
Petitioner's right to appeal in this very same case.

The material facts of the record support Petitioner's
claims that he was denied his right to counsel of choice.
If their is any question to the fact that Mr. Limas was
ready and willing to take the case upon the court allowing
Mr. Barnard to withdraw. An evidentiary hearing could
develop these facts. The Respondents motion for summary
judgement should fail on this issue.

## 7.  Lack Of Effective Assistance Of Counsel

Respondent's summary judgement should fail on this issue
because Petitioner has, in fact, met his burden to prove
ineffective assistance of counsel. Petitioner has met both
prongs of **Strickland v. Washington,** 466 U.S. 668, 104

S.Ct. 2052 (1984). The record reveals all facts that would support Petitioner's Sixth and Fourteenth Amendment claims that he was denied effective assistance of counsel in both cases.

In both cases counsel Glen Barnard, by his own testimony states he had not prepared for the cases. (Fed Writ 35-40) The record also reflects that 80 % of both trials was about a nonexistent drug deal and these extraneous offenses should ever been before the jury. Respondent makes a claim that these issues of drugs were before the jury for the issue of probable cause. But the issue of probable cause was not an issue for the jury to decide.

The first prong of **Strickland** is easily met by Mr. Barnards own admissions of having not prepared for trial in both cases. Petitioner's offers that counsel's performance or lack thereof could not be considered trial strategy, and must obviously indicate "counsels performance fell below the standard of reasonable assistance."

The second prong is also met by Mr. Barnard's own hand. To satisfy the second prong of **Strickland** Petitioner has shown that counsels errors were so serious as to deprive the defendant of a fair trial, a trial whose results is reliable. Mr. Barnard represented Petitioner in a third trial  91-CR-1524-E which resulted in a not guilty verdict. This trial was a mirror image of the first two trials as far as the evidence and case in chief  presented by the state. Yet, in this trial, Mr. Barnard did have time to prepare.

24

He did provide Petitioner's alibi witness. Mr. Barnard did
file the correct motions to exclude extraneous testimony and
did object in open court whenever the State used testimony
to the extraneous offenses.

With the same evidence provided at two prior trials
Petitioner was found not guilty. Thereby overcoming
Respondent's theory that all the evidence established his
guilt. Petitioner has met the second prong of the
**Strickland** test "there is a reasonable probability that, but
for counsel's unprofessional errors, the result of the
proceeding would have been different", **Strickland**, 467
U.S.at 694, 106 S.Ct. 2068. The third trial proves this.
The affidavit by Glen Barnard proves that even he felt this
to be the case. (See Exhibit "F" of Fed Writ) "It is my
belief that if I had been provided adequate time to obtain
Mr. Ashcraft's witness and prepare, that the outcome of
Mr. Ashcraft's trial would have been acquittal. Proof of
this would be that I defended Mr. Ashcraft in a very similar
Cause Number 91-CR-1524-E which resulted in acquittal."
From Mr. Barnard's Affidavit.

We also need to remember that the Texas Court of
Criminal Appeals in 1993 found that Mr. Barnard was indeed
ineffective counsel in protecting Petitioner's right to
appeal. So there is record evidence that Mr. Barnard had
previously been found ineffective as counsel for Petitioner.

Respondent's motion for summary judgement must fail on
this point. Petitioner has provided enough facts and law
that he was denied his constitutional right to effective
assistance of counsel at both trials.

25
## CONCLUSION

Respondent has failed to properly perform the duty of examining the claims presented by Habeas Corpus application.   The State's highest court made a cursory review condemned by the Fifth Circuit issuing a "white card" to accede its decision.   Thus, the State has not provided opportunity for a full and fair litigation of Petitioner's Habeas Corpus issues.

The Supreme Court determined similarly from **Townsend v. Sain**, 83 S.Ct. 745 (1967) that;

> " ... even where the procedure employed does not violate the constitution, if it appears to be seriously inadequate for the ascertainment truth it is the federal judge's <u>duty</u> to disregard the state findings and take evidence anew."

Id. @ 759.

In turn, Respondent has made no overwhelming nor substantial presentation of fact or law to show that no dispute of fact remains.   In fact, Respondents assertions do not overcome the initial claims as asserted by the Habeas Corpus Writ.

Petitioner respectfully requests that this Honorable Court by diligent review con not deny that a dispute of issues of fact  and law remains between each party thereby requiring that Respondent's motion for summary judgement be denied and an evidentiary hearing be required to resolve issues in dispute.

Respectfully submitted the 3rd day of November, 2001

Jon Alan Ashcraft

26

## CERTIFICATE OF SERVICE

I, Jon Alan Ashcraft, hereby certify that a true and correct copy of the above and foregoing document has been served on the State's Prosecuting Attorney by placing a copy in prepaid U.S. Mail sent to P.O. Box 12548, Capitol Station Austin, Texas 78711-2548 on this date November 3, 2001.

Jon Alan Ashcraft

## VERIFICATION

I, Jon Alan Ashcraft, Petitioner declare under penalty of perjury that the above and foregoing is true and correct to the best of my knowledge.

Executed this Date: November 3, 2001.

Jon Alan Ashcraft

COUNTY OF BRAZORIA          \*           **EXHIBIT "A"**

                                        \*

STATE OF TEXAS             \*

## AFFIDAVIT

COMES NOW, JON ALAN ASHCRAFT, TDCJ-ID # 638807, hereby referred to as Petitioner in this affidavit, being over 21 years of age and of sound mind make the following statement:

1. Petitioner was approached on June 23, 1991 by Augustine Pena and Juanita Torres requesting to borrow ($20) twenty dollars.

2. Petitioner and the couple engaged in a conversation for approximately (20) minutes when Augustine Pena asked if he could borrow the money.

3. Approximately two hours later Officer Mitchel in a marked police car pulled in Petitioner's driveway and spoke with Petitioner about a car parked in the driveway. After, being told the car belonged to a friend who was in the hospital after just having a baby the officer left.

4. Approximately two hours after that two men arrived in a white pickup. They approached Petitioner's back door. Petitioner came out and they alleged they were police officers and arrested Petitioner.

5. The police alleged to have a search warrant to search Petitioner's house. When Petitioner asked to see this alleged search warrant Petitioner was shown a one page sheet of paper titled search warrant. No where on this one sheet of paper was the Petitioner's name, address and/or things to be searched. There was no attached affidavit.

6. Petitioner instructed the police to take off the handcuffs and to leave his house because the piece of paper he was shown was not a valid search warrant to search his house. He asked the police where it had his address or even his name on it. At no time did Petitioner and/or his mother consent or give the police permission to enter and/or search the house.

7. When the police realized that the search warrant did not have the name of petitioner on it nor did it have his address and did not list anything to be searched they became belligerent, Detective Araiza

Page 1 of 5 pages

told Petitioner "If you do not take us in the house
and show us drugs and stolen property we are going
in the house and arrest your mother and take
everything in the house."

8.  After the threats were made several times a search
took place.  Every time Petitioner would refuse to
cooperate with the search, the words to the effect
were stated and restated, "you are not cooperating,
we are going to arrest your mother!"  Both Detective
Araiza and Detective Ramon Vela made these repeated
threats to arrest Petitioner's mother if Petitioner
did not cooperate to whatever police wanted.
Fearing his mother my have an asthma attack
and or heart attack Petitioner did what police said.

9.  Police while searching Petitioner's room would grab
handfuls numerous household items.  A number of
times  Petitioner asked police to leave items alone
that had belonged to his dead grandmother and dead
brother and the police would just throw them on the
floor and take them anyway.  Police rummaged through
Petitioner's room and had no list of items that they
were looking for.

10. After searching and gathering various household item
the police loaded these items in the back of the
white pickup.  At no time was an inventory list of
the items taken ever made.  Nor was an inventory
list of the items gathered ever left with Petitioner
and/or his mother before police left as required by
law.

11. Petitioner was transported to the Harlingen Police
Station.  Sometime later Petitioner saw the police
bring the items taken from his house brought into
the Detective's office area.   These items were put
in an area that already had some other property in
the room.  The items were mixed together.

12. The items were not logged into the evidence room
and it took several days of Petitioner's mother
asking for a list before Detective Byrum made and
brought Petitioner's mother an inventory list.

13. Petitioner asked the police for an attorney and
police laughed and joked that a lawyer could not
help him now and all a lawyer would do would be to
take Petitioner's money.

14. Police then told Petitioner that he had to make a
statement.  Petitioner told police that he had just

injected heroin and that his back was hurting and he
needed his codeine medication.   Detective Byrum told
Petitioner "if you make a statement I will go get
your codeine medication."

15.   Petitioner was concerned about his mother and asked
      police if his mother was O.K.   Petitioner was under
      the impression that police were still at his
      mother's house.

16.   Police then told Petitioner a second time that he
      had to make a statement.   Petitioner asked police a
      second time if he could speak to a lawyer.
      Detective Aeaiza then told Petitioner that "if you
      do not make a statement saying you had did all those
      burglaries in Parkwood he was going to go back to
      Petitioner's house and arrest his mother."

17.   Petitioner fearing for his mother's health and
      safety began to make a statement.   Every time
      Petitioner's statement did not satisfy Detective
      Araiza he would threaten to go back and arrest
      Petitioner's mother.   Petitioner made a statement
      that would satisfy the Detectives.   The statement
      was made under duress and coercion.

18.   When Petitioner signed the statement Detective
      Araiza told him to initial each of the Miranda
      rights at the top of the statement to show that
      Petitioner waived these rights.   Petitioner did
      not initial the waiver for the lawyer because
      Petitioner never waived his right to a lawyer.

19.   The next day Petitioner was taken to be arraigned
      but could hardly walk due to heroin withdrawals and
      the numerous codeine pills that the police had
      given him.

20.   Upon arriving back to the police station Detective
      Byrum gave Petitioner more pills.   Detective Araiza
      then told Petitioner that he had to make a second
      statement so "he could clear all those Parkwood
      burglaries."   Petitioner told Detective Araiza that
      he did not want to make a statement.   Detective
      Araiza once again told Petitioner "if you do not
      make statement to clear all these burglaries, I will
      go back to your house and arrest your mother."

21.   Petitioner was loaded in the back seat of Detective
      Araiza's car.   Petitioner was driven all around the
      neighborhood and asked "did you do that house?"
      Petitioner was so drugged out from the codeine and
      feared for his mother that he would say yes or I am
      not sure.   Police then made a list of houses.

22. Some time later Petitioner was given the second statement to sign. Petitioner was drugged up he could not even read the statement. Detective Araiza once again threatened him, "if he did not sign the statement his mother would be arrested." Petitioner under duress and coercion signed the second statement.

23. No illegal drugs were found at Petitioner's house.

24. Petitioner's house had also been burglarized twice in this time frame that houses in Parkwood were being burglarized.

25. When detectives found Augustine Pena and Juanita Torres they had lost sight of them for over 15 minutes and found them at a park in Harlingen known for drug transactions.

26. When police stopped Augustine Pene and Juanita Torres the police told the couple "you just bought drugs from Jon Ashcraft at his house." Thereby, giving the couple the information the police were seeking. Thus, tainting their statements.

27. The couple was told by police "give us a statement that you bought drugs from Jon Ashcraft and we will let you go."

28. The couple had just injected heroin before they gave their statements to police.

29. Juanita Torres testified that her voluntary statement was given under coercion and duress.

30. Petitioner hired Glen Barnard for the two cases he was arrested for  drugs and one burglary.

31. When Petitioner realized that Glen Barnard had no intention of defending him, but just wanted Petitioner to sign a plea bargin, Petitioner contacted three other lawyers.

32. The Honorale Abel Limas told Petitioner that he would take his case only after Glen Barnard withdrew from the attorney of record. The trial court would not allow Glen Barnard to withdraw. Therefore denying Petitioner of his right to the retained attorney of his choice.

Page 4 of 5 pages

33. Petitioner was forced to go to trial with an attorney whom there was great conflict and had no intentions to prepare for trial.

34. Petitioner had not paid Glen Barnard his whole fee because he would not do his job.

35. The Court then, at strong objection by Petitioner, appointed Glen Barnard to the other cases, yet, would not allow Mr. Barnard, time to prepare after he was appointed, and/or serve Petitioner a copy of the indictment for the cases as prescribed by Barnard was held in contempt of court for failing to appear for pretrial hearing.


I, Jon Alan Ashcraft, referred to as Petitioner in this affidavit, being presently incarcerated at the Wayne Scott Unit at Rt. 5 Box 1500, Angleton, Texas 77515, declare under penalty of perjury that the above and foregoing is true and correct to the best of my knowledge.

EXECUTED THIS DATE, OCTOBER 31, 2001.

JON ALAN ASHCRAFT

Page 5 of 5 pages