47

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 3 0 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JON ALAN ASHCRAFT, | * | |
| Petitioner | * | |
| | * | MISC. NO. B-98-031 |
| | * | |
| V. | * | |
| | * | |
| JANIE COCKRELL, DIRECTOR | * | |
| TEXAS DEPARTMENT OF | * | |
| CRIMINAL JUSTICE, | * | |
| INSTITUTIONAL DIVISION, | * | |
| Respondent. | * | |
| | * | |

## APPELLANT'S WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS IN MAGISTRATE JUDGE'S AMENDED  REPORT AND RECOMMENDATIONS TO APPELLANT'S CERTIFICATE OF APPEALABILITY

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Jon Alan Ashcraft, Appellant Pro Se, hereinafter "Appellant" who now presents this "Appellant's Written Objections to Proposed Findings, Conclusions and Recommendations in Magistrate Judge's Amended Report and Recommendations to Appellant's Certificate of Appealability" and brief in support.

Therefore, Petitioner respectfully requests this Court consider this motion with the liberal scrutiny in keeping with the proviso enunciated in **Haines v. Kerner,** 404 U.S. 519, 92 SCt. 594 (1971), rather than considering this matter under the stringent standards applied to pleadings drafted by skilled counsel. In support thereof Petitioner as non-movant would show the Court the following:

-1-

2

## 1.

Appellant received the Magistrate Judge's Amended Report and Recommendations on July 19. 2002. On July 26, 2002 Appellant filed his first motion for extension of time to file objections. That motion was granted upon which said objections are due by August 30, 2002. Appellant now timely files his objections to the Magistrate Judges Amended report and Recommendations to Appellants Certificate of Appealability.

## II.

Petitioner's Written Objections to the Proposed Findings, Conclusions, and Recommendations in Magistrate Judge's Amended Report and Recommendations, hereinafter, referred to as "Report", in listed form are as follows:

It appears that the Magistrate Judge has abused his discretion by failing to perform a fair and complete review Appellant's Certificate of Appealability as well as the U.S. District Judge has abused her discretion for failing to give Appellant a full and fair review with regard to Appellant's § 2254 petition. Appellant's objections in listed form are as follows:

1. The District Court has repeatedly "Abused it's Discretion" in the court's duty to uphold the United States of America's Laws and Constitutional Rights provided to Appellant;

2. The Court did not invoke "Summary Judgement Standards" in its review of Appellant's § 2254 hence erred in granting Summary Judgement;

3. The Court erred in adoption the Magistrate Judges Report and Recommendations to Appellant's § 2254 petition;

3

4. The Court in effect has acted as an accomplice in
the willful transgression of the Laws of the United
States;

5. The Court ignores **Napue v. Illinois,** 79 SCt. 1173
@ 1177 (1959) in review of violations of Appellant's
Constitutional Rights;

6. The Court ignores **Williams v. Taylor,** 120 SCt. 1495
(2000) in the standard for review of Appellant's
§ 2254 petition.

7. The Court literally ignores Appellant's § 2254
petition as a whole and the documentation of
the Constitutional Violations that Appellant has
proved time and time again by documentation provided
to the District Court;

8. The Court fails to recognize that Appellant's Fifth
and Fourteenth Constitutional Rights were violated
by the denial of a Fair and Unbiased Tribunal which
resulted in a Conflict of Interest in review
Appellant's claims; (See page 3 of original
petition)

9. The Court fails to recognize that Appellant's Fourth
Amendment Constitutional Rights were violated by an
illegal search and seizure when a search took place
at his home with a search based on an illegal search
warrant and affidavit which lacked probable cause;
(See page 5 of original petition)

10. The Court fails to recognize that Appellant's Fourth
Amendment Constitutional Rights were violated by an
unconstitutional search and seizure; (See page 14
of original petition)

11. The Court fails to recognize that Appellant's Fifth
and Fourteenth Amendment Constitutional Rights were
violated by him being convicted with "No Evidence";
(See page 21 of original petition)

12. The Court fails to recognize that Appellant's Fourth
and Fifth Amendment Constitutional Rights were
violated with the use of involuntary confessions
and information proven inadmissible was offered
into record evidence; (See page 26 of original
petition)

13. The Court fails to recognize that Appellant's Sixth
Amendment Constitutional Rights were violated by
being denied the right to Counsel of Choice; (See
page 33 of original petition)

4

14. The Court fails to recognize that Appellant's Sixth
and Fourteenth Amendment Constitutional Rights were
violated by the denial of Effective Assistance of
Counsel; (See page 35 of original petition)

15. The Magistrate **still cannot get the facts correct
to Appellant's pleadings** in violation of his
Appellant's Constitutional Rights. Proving that
the Court is not even straight on the most minimal
facts. Which, in effect, proves that the Court has
not given Appellant a full and fair hearing. Hence
it is necessary to allow an Appeal.

### III.

Due to the fact that Appellant's § 2254 petition was
filed November 30, 1998 and **was not even** considered some
(20) twenty months his petition collected dust at the Court
before anyone even answered his petition. Then the State
delayed response for more than a year. For this reason
maybe the Court has failed to remember what the issued
really are.

Appellant has repeatedly shown this Court that his
constitutional rights were violated. It is this Court that
has turned a blind eye to these constitutional violation.
In fact, at times, Appellant has been given the impression
from said Court that the Court was working as co-counsel for
the State. This is apparent by the rulings and final
outcome of Appellant's § 2254 petition by this Court.
Therefore, it is **imperative** that this Certificate of
Appelability be <u>GRANTED</u> so that Appellant's constitutional
violations **can be considered by <u>reasonable jurists.</u>** Those
reasonable jurists being found at the United States Court of
Appeals for the Fifth Circuit. This District Court should
not fear an appellate review of its findings if it feels it

5

has ruled correctly.  Remember, there is nothing to fear but fear itself.

## IV.

Appellant will now make a substantial showing of the denial of his constitutional rights once again as he already has in his original § 2254 petition. See **Slack v. McDaniel**, 529 U.S. 473, 483, 120 SCt. 1595, 1603, 146 LEd.2d 542 (2000).  Appellant will further demonstrate that these issues are debatable among jurists of reason, that a court could resolve the issues in a different manner, and that questions are adequate to deserve encouragement to proceed further.  See Slack supra @ 1604.  In fact, Appellant "demonstrated that reasonable jurists would find the district court's assessment of the constitutional claims [are] debatable [and]/ or wrong."  Slack @ 1604.

CONSTITUTIONAL CLAIM NUMBER ONE

This claim is in correspondence with objection Number (8) Eight.  Appellant was denied Due Process by Conflict of Interest in that his Fifth and Fourteenth Amendments to the Constitution were violated in denial of an opportunity to be heard before an Unbiased Tribunal. A full argument is laid out in Appellant's Ground for Relief Number (1) One in his original § 2254 petition.  In that there was a Conflict of Interest by a former law partner of Appellant's trial attorney wrote the opinion in Appellant's state appeal.

6

This Court has confirmed that Justice Melchor Chavez of the Thirteenth Court of Appeals and Appellant's trial attorney, Glen Barnard, were law partners.  State Bar Rules of Professional Conduct forbid counsel's (or, any member thereof), representation of a client in any litigation where a fiduciary relationship existed and is subject to conflict of interest.  Such was the case in Appellant's case.

CONSTITUTIONAL CLAIM NUMBER TWO

This claim is in correspondence with objection Number (9) Nine.  Appellant was denied his Fourth Amendment of the Constitution Rights when an illegal search and seizure took place at his home with a search based on an illegal search warrant and affidavit which lacked probable cause.  A full argument is laid out in Appellant's Ground Number (2) Two in his original § 2254 petition.

The search warrant used at Appellant's house on its face failed to list person, place and thing to be searched  in violation of the Fourth Amendment of the Constitution.  A one page document was served as a search warrant at Appellant's house.  (See Exhibit "B")  This is how the search warrant appeared when served at Appellant's House.

Although the affidavit to the search warrant contained this information it was not attached to the search warrant. (See Exhibit "A").  The search warrant on its face states that the affidavit states **which said affidavit is here now part of for all purposes."**  (See Exhibit "B")  In fact, it is questionable if there was even an affidavit made at the time of service.  This confirmed by Detective Ariza's own

7

words in the last three pages of Exhibit "B". It is an
undisputed fact that the search warrant as served on its
face did not have person, place or thing listed in
violation of the Fourth Amendment of the United States
Constitution. This alone should give merit that a
reasonable jurist would find a constitutional violation took
place.

The search warrant as served was a "General Search
Warrant" which is a violation of the Fourth Amendment.
Appellant has repeatedly been denied a full and fair hearing
on this Fourth Amendment Claim. The state court never gave
Appellant a full and fair hearing on this issue. As well
the U.S. District Court has failed to give Appellant a full
and fair hearing. Therefore, it is imperative Appellant be
given a fair opportunity for the Fifth Circuit to rule on
this Constitutional Violation.

Further, Detective Araiza'a own testimony confirms that
even he did not know whether the information by his alleged
informants was credible or reliable. (See Exhibit "C")
Surly if the detective that drafted the probable cause
affidavit did not even know if the information he used as
probable cause is credible or reliable the Magistrate Judge
could not conclude so. Therefore Appellant's Fourth
Amendment right to the Constitution has been violated at
this point too.

8

## CONSTITUTIONAL CLAIM NUMBER THREE

This claim is in correspondence with objection Number (10) TEN. Appellant was denied his Fourth Amendment Rights to the Constitution when his rights were violated under an Unconstitutional Search and Seizure. A full argument is laid out in Appellant's Ground Number (3) Three in his original § 2254 petition. Record evidence shows that police using deceitful methods loaded the probable cause affidavit with falsehoods not facts. In fact, on Appellant's first round of appeal it was found there was no probable cause. But when the State was offered a second shot at the pie by illegally getting a Petition for Discretionary Review the case was relied on the opinion of Justice Melchor Chavez. This biased opinion did not even review the falsehoods by detectives.

The record shows that Detective Araiza knowingly mislead the Magistrate Judge that signed the search warrant. Furthermore the so called informant's were given the information the police wanted by police when first pulled over. Then under coercion the informants repeated what police had told then. In fact, at trial Ms. Torres admitted her statement was under coercion. Then police dreamed they had probable cause because they heard what they wanted. Then under the cloud of deceit police allegedly secured a search warrant before the search. However, testimonial facts by Detective Araiza would lead one to believe the affidavit "wasn't done" (See Exhibit "B") Whatever the

9

case there was no probable cause to search Appellant's house
in violation of his Fourth Amendment Right to the
Constitution.

CONSTITUTIONAL CLAIM NUMBER FOUR

This claim corresponds with objection Number (11) Eleven
in that Appellant's Fifth and Fourteenth Amendment
Constitutional Rights were violated by him being convicted
with "No Evidence." A full argument is laid out in
Appellant's Ground for Relief Number (4) Four. Appellant
alleges that "No Evidence" is available to prove each
element of the offence as charged. This violates the Fifth
and Fourteenth Amendments to the United States Constitution.

The state has failed to meet its burden to prove the
four elements of burglary as required by the Texas Penal
Code. The thrust of the state's only evidence relies on the
coerced statements by Appellant. After an illegal arrest.
The chain of evidence was broken. The search and arrest was
illegal. Police did nothing more then act as criminals
themselves in their prosecution of Appellant. The evidence
presented at Appellant's trial is void of proof of each
element of the offense charged. Therefore Appellant's
conviction relies on "No Evidence" in violation of his
Constitutional Rights.

CONSTITUTIONAL CLAIM NUMBER FIVE

This claim is in correspondence with objection Number
(12) Twelve. Appellant was denied his Fourth and Fifth
Amendment Constitutional Rights with Involuntary Confessions

and information proven inadmissible offered into record
evidence.  A full argument is laid out in Appellant's Ground
for Relief Number (5) Five in his original § 2254 petition.
Appellant's will was overborne by multiple events.  The fact
that he had used heroin just shortly before his arrest as
well as police giving him codeine combined with the repeated
threats to arrest Appellant's 68 year old mother if he did
not cooperate lead to two coerced confessions.

   Aside from being under illegal arrest, the moment police
realized that the search warrant failed to meet
constitutional standards of person, place and thing police
began to threaten arrest of Appellant's mother.  Even though
police had no evidence that Appellant's mother knew of any
illegal activity police used Appellant's mother's well being
as a crowbar to pry confessions out of Appellant.  This is
documented by record evidence.  Exhibit "A" has Appellant's
mother testify that she heard Detective Araiza tell
Appellant that if he (Appellant) did not cooperate his
mother would be arrested. (See Exhibit "D")

   In short Detective Araiza finally admits that the words
and phrases he repeadtedly used "cooperate or we will arrest
your mother"  "Cooperation" meaning confess and show him
drugs and stolen property was a threat.  In Exhibit "E"
Detective Araiza admits this **was a threat.**  Therefore
Appellant's statements were involuntary and his
Constitutional Rights were Violated.

11

## CONSTITUTIONAL CLAIM NUMBER SIX

This claim is in correspondence with objection Number
(13) Thirteen.  Appellant was denied his Sixth Amendment
Constitutional Right to Counsel of Choice.  A full argument
is laid out in Appellant's Ground for Relief Number (6) Six
in his original § 2254 petition. Appellant had retained
Glen Barnard as his trial attorney.  When it became
apparent to Appellant that his trial attorney, Glen Barnard,
only intention was to get Appellant to plead guilty to a
plea bargain Appellant spoke with a couple of other
attorneys.  Abel Limis agreed to take Appellant's case but
said that Glen Barnard would have to withdraw before he
could take the case.  At the first opportunity available
Appellant as well as Glen Barnard attempted to allow Glen
Barnard to withdraw.  However the trial Judge Rogelio Valdez
denied this request.

The trial judge knowing that Glen Barnard and Appellant
were having problems and Appellant had an attorney waiting
to take Glen Barnard's place the trial judge violated
Appellant's right to counsel of choice.  This was a
violation of Appellant's Sixth Amendment Constitutional
Rights which also offends the Fourteenth Amendment to the
Constitution.  Appellant was forced to go to trial with
unwanted counsel as well as counsel that did not want to
represent Appellant.  Trial counsel's representation
admittedly fell below the constitutional standard of
effective assistance of counsel, inasmuch Glen Barnard
attempted to eliminate his role as counsel to Appellant.  As

12

the saying goes you can lead a horse to water but you can't
make him drink.  You could drag Glen Barnard to the court
room but you can't make him defend appellant effectively if
he does not want to.  In fact, Mr. Barnard was held in
contempt of court for failing to appear.  As well as had to
be hunted down to make him appear.  Clearly the record
reflects that Glen Barnard was ineffective as counsel.  This
violated Appellant's Constitutional rights to Counsel of
Choice.

CONSTITUTIONAL CLAIM NUMBER SEVEN

This claim is in correspondence with objection Number
(14) Fourteen.  Appellant was denied his Sixth and
Fourteenth Amendments of the Constitution in being denied
Effective Assistance of Counsel.  A full argument is laid
out in Appellant's Ground for Relief Number (7) Seven in his
original § 2254 petition.  Due to the fact that trial
counsel did not represent Appellant it became apparent that
Glen Barnatd was not going to live up to his professional
duties as a licensed attorney.  Appellant made the problems
known to the trial judge, however, Judge Valdez denied
Appellant's repeated requests to change attorneys to Abel
Limas.

Therefore Appellant was forced to go to two trials with
Glen Barnard as Appellant's trial counsel.  The results were
Appellant's being found guilty.  Even though Glen Barnard
made the trial court aware that he was not prepared the
trial court forced Appellant to be denied Appellant

13

Effective Assistance of counsel.  Proof is Exhibit "F" in
which Glen Barnard in a sworn affidavit that he was
ineffective as counsel.  However both state and federal
courts have denied Appellant to a full and fair hearing on
this issue.  There is however evidence that Appellant was
denied Effective Assistance of Counsel in violation of his
constitutional rights.

### OTHER ISSUES AT HAND

It has become apparent to Appellant that this United
States District Court has no intention uphold Appellant's
Constitutional Rights.  In fact, the Magistrate Judge has
repeatedly gotten the facts wrong in Appellant's pleadings.
That is about the only consistent event that has taken place
in this whole review of Appellant's § 2254 petition review.

Example, under Background of this "Report" the
Magistrate Judge has Appellant as "a state prisoner
presently incarcerated at the Retrieve Unit." Wrong !
Appellant in docket entry 30 Appellant had changed his
address to the Le Blanc Unit in Beaumont, Texas.  Yet, the
Magistrate Judge still had Appellant at Retrieve in
Angleton, Texas.  Then in docket entry number 40 Appellant
once again notifies the court that he has changed his
address to his home address in Harlingen, Texas.  In fact in
Appellant's Certificate of Appealability in Exhibit "A" is a
copy of the envelope showing that he has been released.
That docket entry on 6/28/02 mail returned as
undeliverable.  Why because prisoner has been released (See
Exhibit "A" on Certificate of Appealability)

14

What this shows to Appellant is that the Magistrate Judge can't even get the smallest of facts correct in Appellant's pleadings.  So how could either the Magistrate Judge or even the U.S. District Judge give Appellant a full and fair hearing on his constitutional rights violation. This is really a sad sad situation.  The Court has become detached from its duty to protect Appellant's Constitutional Rights.  Something that both Judges swore on the Bible and to the Citizens of the United States that they would protect our constitutional rights. As one of the last lines of defense of Constitutional Rights to a citizen of the United States both Judges have sadly failed.  In fact, someone thinks that my petition was a § 2255 petition.  Wrong again !

All Appellant requests is that he be given a chance for another forum of Judges in the Fifth Circuit to review his constitutional violations.  If both Judges in this District Court feel that they have made the correct judgement then why fear the Fifth Circuit to review your work  There still is a chance for the Judges to do the right thing.  The choice is yours.  Face your fears give Appellant a chance to have his constitution rights violation corrected.  Appellant only spent almost (11) eleven years unjustly imprisoned. Appellant on November 5, 1996 had a correctional officer try to gouge out Appellant's eyes.  Then on August 2, 2000 Appellant had boiling hot water thrown on him by a "CRAZY" fellow offender.  Yes, he is certified "Crazy" and can not

15

even be prosecuted for the aggravated assault indictment pending on him.  Through the grace of God Appellant was released so that he could take care of his gravely ill 78 year old mother.  Yea, the same person the brave Harlingen Police Department so boldly threatened to arrest, Appellant's mother.  This same court is well aware of the Harlingen Police Department's track record.

Judges due the right thing for once.  Rule correctly on Appellant's well documented Constitutional Violation.  Or GRANT Appellant's Certificate Of Appealability and let the Fifth Circuit Rule.

### CONCLUSION

Appellant has once again shown the Court that his Constitutional Rights Violations are valid and exist. Appellant can show and has repeatedly shown that a reasonable jurists would find that Appellant has made a substantial showing of denial of his constitutional rights. That reasonable jurists would find the district courts's assessment of the constitutional claims [are] debatable [and are]/or wrong.  **Slack v McDaniel**, 120 SCt. at 1603 and 1604 (2000).

WHEREFORE, PREMISES CONSIDERED, Appellant Prays that this Honorable Court Grant Appellant's Certificate of Appealability or in the alternative reverse its pervious rulings and grant Appellant's § 2254 petition and all other relief available.

16

Respectfully Submitted this date: August 30, 2002.

Jon Alan Ashcraft
Appellant, Pro Se
1710 S. Parkwood
Harlingen, Texas
                      78550-8033

## CERTIFICATE OF SERVICE

I, Jon Alan Ashcraft, hereby certify that a true and
correct copy of the above and foregoing document has been
served on the State's Prosecuting Attorney by placing a copy
in a prepaid U.S. Mail envelope and sent to P.O. Box 12548,
Capitol Station, Austin, Texas 78711-2540 on or about this
date August 30, 2002.

Jon Alan Ashcraft

## VERIFICATION

I, Jon Alan Ashcraft, Appellant declare under penalty of
perjury that the above and forgoing is true and correct to
the best of my knowledge.

EXECUTED THIS DATE: August 30, 2002.

Jon Alan Ashcraft

# EXHIBIT INDEX

**Exhibit**

**"A"**      Testimony from Jeane K. Ashcraft
         (1) One (1) page Search Warrant / No Affidavit
         (2) Coercion

**"B"**      Search Warrant as served Testimony by N. Araiza
         (One page search warrant – no affidavit attached)

**"C"**      Testimony from Detective N. Araiza
         (No Probable Cause)

**"D"**      Testimony from Detective N. Araiza (COERCION)

**"E"**      Testimony from Detective N. Araiza (COERCION)
         (Confirms threat to Petitioner's Mother)

**"F"**      Testimony Glen Barnard
         (Did not prepare for trial)

## EXHIBIT "A"

**TESTIMONY FROM DEFENDANT'S MOTHER JEANE K. ASHCRAFT IN THE MOTION
TO SUPPRESS 91-CR-1371-E & 91-CR-1521-E:**

(1)  Testimony that Search Warrant that was served was **only one page
with no Affidavit Attached,**    page 234,

(2)  Testimony proves **that THREATS WERE MADE TO GET COOPERATION
"COERCION",**  pages 233 & 235.

**From: Vol. 1, "Transcripts" 91-CR-1521-E Pages 233 - 235.**

1    Q.    Did you hear any conversation between Jon and that man

2          or any other man?

3    A.    I think it was Nick Araiza.

4    Q.    Uh-huh.

5    A.    Said that if we cooperate and he confesses that they

6          wouldn't arrest me.  And some officer came in and sat

7          beside me in the kitchen.  I don't know what his name

8          was.

9    Q.    Okay.

10   A.    And there was a whole bunch of men.  I don't know how

11         many; six, five, six, seven and a dog.

12   Q.    Okay.  When Jon came back in the house, was he already

13         handcuffed?

14   A.    Yes.  He was handcuffed outside.

15   Q.    While he was outside, you were there, I guess, by the

16         door?

17   A.    Not right by the door.

18   Q.    Okay.

19   A.    A little distance.

20   Q.    Could you hear anyone tell Jon that if he cooperated

21         while he was outside, that if he cooperated they would

22         not arrest you?

23   A.    Yes.

24   Q.    Did they tell him anything else about that or what

25         could happen?

233    225

1    A.   They handed me a search warrant.

2    Q.   They handed it to you?

3    A.   Yeah.

4    Q.   Okay.  Did you look at it and read it?

5    A.   It didn't say anything.  It just said, you know,

6         typewritten stuff, that's form stuff.  And then a name

7         that I couldn't read.

8    Q.   Okay.

9    A.   And I didn't see the back of it until later.

10   Q.   Was it just one single page?

11   A.   Yeah.

12   Q.   Okay.  Was it -- at that time was there any affidavit

13        attached to it?

14   A.   Nothing.  That was all I saw.

15   Q.   And that was left with you after they finally left?

16   A.   Yeah, uh-huh.

17   Q.   Okay.  About how long do you recall them being in your

18        home that afternoon?

19   A.   I guess a couple of hours.  I don't know.

20   Q.   Okay.

21   A.   I was sitting in the kitchen with the officer.

22   Q.   You remained in the kitchen the whole time?

23   A.   No.  I had to go to the bathroom and the officer went

24        to the bathroom and checked it out first and then let

25        me go in.  And then we went back to the kitchen.

226

234

1    Q.   Okay.  While they were in the house, and while Jon was

2         there, did anybody come up to you and say to you that

3         so long as your son cooperated that they would not

4         arrest you or charge you with any crime?  Did anybody

5         tell you that?

6    A.   Yeah, uh-huh.

7    Q.   Do you recall who it was?

8    A.   Well, I don't remember.  I guess it was Nick Araiza.

9    Q.   Well, you've seen Mr. Araiza here today, have you not?

10   A.   Uh-huh.

11   Q.   Is that the same person that told you that?

12   A.   Yeah.

13   Q.   Do you remember any other officer saying anything like

14        that to you that day?

15   A.   No.

16   Q.   Okay.

17   A.   They came up in the kitchen with the dog and walked

18        around the den and walked around and then they went

19        outside with the dog.  I had to bring the dogs in the

20        house to get them out of the way of the other dogs.

21             MR. MILLS:  Your Honor, I object and ask

22        that the witness be put on a question and answer.  She

23        is narrating.

24             THE COURT:  Let us not proceed on a

25        narrative, Counsel.

227

## EXHIBIT "B"

**SEARCH WARRANT AS SERVED ON JUNE 23, 1991:**

This is an Invalid Search Warrant in that it violated the Fourth
Amendment to the United States Constitution by **failing to describe
person, place and thing to be searched** on the face of the Search
Warrant.

**THERE WAS NO AFFIDAVIT ATTACHED**

These documents come from the hearing held March 4, 1992 in the 357th
Judicial District in Cameron County, Texas in Cause no.'s 91-CR-1371-E
& 91-CR-1521-E, by Detective Nicolas Araiza, the Dectective that
served the Search Warrant.

From: Vol. 1, "Transcripts" of 91-CR-1521-E, pages 208 - 211.

## SEARCH WARRANT

### THE STATE OF TEXAS

COUNTY OF ___Cameron___

THE STATE OF TEXAS to the Sheriff or any Peace Officer of ___Cameron___ County, Texas or any Peace Officer of the State of Texas, GREETING:

WHEREAS, the Affiant whose name appears on the attached affidavit is a Peace Officer under the laws of Texas and did heretofore this day subscribe and swear to said Affidavit before me (which said Affidavit is here now made part hereof for all purposes), and whereas I find that the verified facts stated by Affiant in said Affidavit show that Affiant has probable cause for the belief expressed therein and establish existence of proper grounds for Issuance of this Warrant; now, therefore, you are commanded to enter the suspected place described in said Affidavit and to there search for the personal property described in said Affidavit and to seize same and to arrest and bring before me each suspected party named in said Affidavit.

Further, you are ORDERED, pursuant to the provisions of Article 18.10, Texas Code of Criminal Procedure, to retain custody of any property seized pursuant to this Warrant, until further order of this Court or any other court of appropriate jurisdiction shall otherwise direct the manner of safekeeping of said property. This Court grants you leave and authority to remove such seized property from this county, if and only if such removal is necessary for the safekeeping of such seized property by you, or if such removal is otherwise authorized by the provisions of Article 18.10, T.C.C.P. You are further ORDERED to give notice to this Court, as a part of the Inventory to he filed subsequent to the execution of this Warrant, and as required by Article 18.10, T.C.C.P., of the place where the property seized hereunder is kept, stored and held.

HEREIN FAIL NOT, but have you then and there this Warrant within three days, exclusive of the day of its issuance and exclusive of the day of its execution, with your return thereon, showing how you have executed the same, filed in this court.

ISSUED THIS THE ___23___ day of ___June___, A.D., 19_91_, at _7:15_ o'clock _P_.M. to certify which witness my hand this day.

_____
MAGISTRATE

208

### TESTIMONY BY DETECTIVE ARAIZA

1  A.   That return I did.

2  Q.   Why was it that you got the, you got the search warrant

3       from Ms. Martinez in La Feria and did not make your

4       return back to her at her office, since she was the

5       issuing magistrate?

6  A.   She was out of town and not available.

7  Q.   All right. - When you all left the Ashcraft residence,

8       Mrs. Ashcraft had the front page of this search

9       warrant; is that correct?

10 A.   It was the front and back.

11 Q.   Okay.  But the back was in blank, basically, at that

12      time?

13 A.   Right, yes.

14 Q.   Okay.  Did you leave her or give to Jon Ashcraft a copy

15      of the affidavit which goes along with the search

16      warrant?

17 A.   No, sir.

18 Q.   Why not, sir?

19 A.   It wasn't done.

20 Q.   Is there some reason why that is not done or was not

21      done on this occasion?

22 A.   No, there was no reason.

23 Q.   As a matter of policy, custom, procedure, do you not

24      normally leave at the scene a copy of the warrant as

25      well as the accompanying affidavit?

185

209

1    A.   Not normally.  We just leave the search warrant signed

2        by the judge.

3    Q.   What is it on that search warrant that you leave that

4        let's the individual know that it was their house that

5        you were coming to serve or number two, what nature of

6        contraband you're looking for?  How do they know other

7        than your word?

8    A.   Well, they have the proof there.  It's signed by the

9        judge and the date.

10   Q.   Okay.  There's nothing on that first page on the

11       reverse side of it that shows who is the suspected

12       party, is it?

13   A.   No, sir.

14   Q.   There's nothing on that front or back that you left or

15       that you showed to either of them that shows what

16       address you were to go to to execute this search

17       warrant?

18   A.   No, sir.

19   Q.   And likewise, there's nothing on there that shows what

20       the nature of the property was that you were looking

21       for, whether drugs, stolen property, machine guns or

22       anything, was there?

23   A.   No, sir.

24   Q.   All right.  And so, and understanding this, Officer,

25       I've known you for a long time, I'm not making an

186

210

1      accusation, but if this is the policy and the

2      procedure, would it not be very possible for a police

3      officer to run out, execute a search warrant signed by

4      a magistrate, thereafter prepare in retrospect an

5      affidavit to fit the circumstances of what was found?

6   A.  I don't believe so.

7   Q.  Okay.  Isn't that the whole reason why you're supposed

8      to leave the copy of the affidavit along with the

9      search warrant when you execute the same?

10  A.  It could be.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

187

211

EXHIBIT "C"


TESTIMONY FROM DETECTIVE NICOLAS ARAIZA IN THE MOTION TO SUPPRESS
FOR 91-CR-1371-E & 91-CR-1521-E:


Verification that information in probable cause affidavit was not
credible or reliable.


From: Vol. 1, "Transcripts" 91-CR-1521-E, pages 214 - 223.

```
1              couldn't be used at that point, right?

2    A.   No.  Well, it looked fresh.  It was like fresh heroin

3         that hadn't been used all the way.

4    Q.   Officer Araiza, don't you normally characterize residue

5         as something that is left over, that's not usable

6         because of the quantity?

7    A.   Well, I determined it that way because it was left over

8         from what they hadn't used.

9    Q.   Did you find anything else besides this residue and the

10        paraphernalia being hypodermic needles?

11   A.   I believe that was all we found.

12   Q.   Okay.  These individuals were Augustin Pena and Juanita

13        Torres; is that correct?

14   A.   I believe that's correct.

15   Q.   Okay.  Were they charged with violation of any law as a

16        result of this stop?

17   A.   No, sir, they weren't.

18   Q.   Were they promised anything in exchange for not being

19        filed upon --

20   A.   No, sir.

21   Q.   -- For which to give a statement?

22   A.   No, sir.

23             MS. BARGUIARENA:  Your Honor, again, I'm

24        going to object.  This hearing is for the suppression

25        of the confessions.
```

87

214

1            THE COURT:  I will sus in the objection at

2        this time, Counsel.  Let's move along, Mr. Barnard.

3        Sustain the objection.

4            MR. BARNARD:  Just one moment, your Honor.

5    Q.  (By Mr. Barnard) Okay.  You say statements were taken?

6    A.  Yes, sir.

7    Q.  And both of these individuals had received their

8        Miranda warnings?

9    A.  Right.

10   Q.  Neither you nor Officer Byrum had previously dealt with

11       these individuals?

12   A.  No, sir.

13   Q.  And you knew nothing of their background at that point

14       in time, on the 23rd of June, 1991?

15   A.  No, sir.

16   Q.  Now, the affidavit which is attached to, I believe it's

17       State's Exhibit No. 1, that being the search warrant

18       and the affidavit, why is it that the affidavit was

19       issued by Ms. Martinez, the Justice of the Peace in La

20       Feria, and yet the return was made at a later time to

21       Judge Klar of Harlingen?

22   A.  It was because Judge Martinez was unavailable and out

23       of town at the time.

24   Q.  You recall how long it was after the search of the

25       Ashcraft residence that you made your return of the

88

215

```
 1    A.   Yes, ma'am.  I read them to him and he understood what

 2         I was saying:

 3    Q.   Okay.  Did you read every single one of these to him?

 4    A.   Yes, ma'am.

 5    Q.   Okay.  And did he sign them in your presence?

 6    A.   Yes, ma'am.

 7              MS. BARGUIARENA:  No further questions,

 8         your Honor.

 9

10                    RECROSS EXAMINATION

11

12    BY MR. BARNARD:

13

14    Q.   Officer Araiza, I'm going to refer you now to State's

15         Exhibit 1, your affidavit attached to the search

16         warrant.  And you state in there, "Affiant had received

17         reliable information from several informants."  Who

18         were these informants and when did you receive the

19         information?

20    A.   It was throughout the months before the search warrant

21         and most of them were either drug addicts that had

22         purchased heroin from him or knew, or that knew of him,

23         of Jon Ashcraft.

24    Q.   Okay.  Can you give me any names of any of those

25         persons?
```

115

216

```
 1   A.   I would have to think about them.

 2   Q.   Would you have records that would show who these

 3        persons are that gave you this information?

 4   A.   It wasn't documented information, but just word of

 5        mouth.

 6   Q.   Stuff that you picked up over a period of a number of

 7        months?

 8   A.   Correct.  Information was obtained through conversation

 9        with them.

10   Q.   Okay.  If there's some way you can remember the names

11        of some or all of these people, would you give me that

12        information?

13   A.   Yes, sir.

14   Q.   Okay.  And let me continue on with this and you can

15        read with me, if you like.  "Received reliable

16        information from several informants.  And the

17        information obtained appeared to be in accordance with

18        what information affiant was aware of."  What do you

19        mean by what you were aware of?

20   A.   I was aware that Jon Ashcraft was selling heroin and

21        that he had also been involved in burglaries in the

22        Parkwood area.

23   Q.   Okay.  When you say "aware," you are not meaning you

24        have knowledge.  You've just heard; isn't that it?

25   A.   Well, information that was obtained throughout the past
```

116

217

1          year or more.

2      Q.   Okay.  But again, I'm saying this is what you have

3          heard, not what you know.  You're not referring that I

4          know because I saw or he had previously admitted to me

5          he sells heroin or he burglarizes houses?

6      A.   Right.

7      Q.   So when you say "information affiant was already aware

8          of," that means information you had heard which you

9          have not yet substantiated as of that day?

10     A.   Correct.

11     Q.   Okay, okay.  And you say, "He was also known to be

12         involved in burglaries of residences."  And again,

13         that's information you obtained over considerable

14         period of time from various people.  Suspicions mostly,

15         right?

16     A.   Well, it's information received, statements and

17         information.

18     Q.   Okay.  But was that something that somebody was

19         supposed to know or something that they had heard or

20         what they believed to be the case?

21     A.   Information that was passed on from other people that

22         they had, they knew that Jon was involved in

23         burglaries.

24     Q.   And you had gathered this information not because you

25         were intending to, but you were picking it up just over

                                                      117

1          a period of several months or a year?

2    A.   Right.

3    Q.   Okay.  Before the surveillance of Mr. Ashcraft's house

4         and before you obtained a search warrant, had you

5         personally had any contact with Jon Alan Ashcraft?

6    A.   I believe I had talked to him.

7    Q.   Can you recall for us on what occasion that may have

8         been?

9    A.   No, not -- I can't recollect right now.

10   Q.   Okay.  If such a thing happened, it would have happened

11        quite sometime back before this search warrant; would

12        that be true, if in fact you ever contacted him or been

13        in touch with him?

14   A.   Right, uh-huh.

15   Q.   And in that conversation or contact with him, he was

16        not telling you, "I am a heroin addict.  I deal in

17        heroin and I burglarize houses," did he?

18   A.   No.

19   Q.   Okay, okay.  In your affidavit also, and now I am

20        getting down to where you're watching the defendant and

21        the individual or individuals from the yellow Nissan,

22        you say that, "The three appeared to be, appeared to be

23        in the process of making a drug deal as is common

24        practice with drug dealers and users.  The couple left

25        right after an apparent exchange."

                                                          118

                                                       219

1          So at this point, at least, what you are saying

2      about these people is just mere suspicion?

3  A.    Right.

4  Q.    Okay.

5               MR. BARNARD:  I have no further questions.

6

7                    REDIRECT EXAMINATION

8

9  BY MS. BARGUIARENA:

10

11 Q.    Officer Araiza, you in fact, had substantiated that a

12     drug deal had gone on prior to your submitting this

13     affidavit; isn't this correct?

14 A.    Yes, ma'am.

15 Q.    Okay.  It had been a recent transaction, hadn't it?

16 A.    Yes, ma'am.

17 Q.    It had nothing to do with a year back?

18 A.    No.

19 Q.    Okay.  Is this information that you had obtained within

20     the last 24 hours?

21 A.    Correct.

22 Q.    Okay.  And that information was that in fact, there was

23     a drug dealing going on; is that right?

24 A.    yes, ma'am.

25 Q.    Okay.  Was that sufficient for you for probable cause

                                                          119

1          to secure a warrant?

2     A.    Yes, ma'am.

3     Q.    A search warrant?

4     A.    Correct.

5                    MS. BARGUIARENA:  Thank you.  Nothing else,

6          your Honor.

7

8                    RECROSS EXAMINATION

9

10    BY MR. BARNARD:

11

12    Q.    Officer Araiza, when you pulled, or when you had these

13          two individuals pulled over by the patrol car, did you

14          and Officer Byrum both approach the individuals?

15    A.    Yes, sir, we did.

16    Q.    Did you ask them where they were coming from or did you

17          tell them where they were coming from, where they had

18          come from?

19    A.    We told them that we were aware of what they had been

20          doing.

21    Q.    Okay.  And I believe it's your testimony that you,

22          insofar as you know, Byrum did not know these people or

23          anything about them prior to this stop and contact?

24    A.    Right.

25    Q.    Okay.  And do you know anything about where they had

                                                           120

                                                      221

1          been immediately prior to going to the Ashcraft

2          residence?

3     A.   I don't recall what they mentioned in their statement.

4     Q.   Okay.  What, you didn't know these people or anything

5          about them, and yet -- so you had no idea whether or

6          not the information you had received was reliable

7          because or that they were reliable persons giving you

8          information, did you?

9     A.   Well, not at that point.

10    Q.   Okay.  They could have been saying, "Hey, let's burn

11         that guy we were just talking to because we don't want

12         our source to get caught," isn't that true?  I mean,

13         they could have thought this and gone ahead and told

14         you what they told you?

15    A.   Well, not according to their -- the way they were

16         conversing with us.

17    Q.   With who?

18    A.   With Augustin Pena and Juanita.

19    Q.   You're referring to Mr. Ashcraft and conversation with

20         those people or you?

21    A.   With myself and Byrum talking to them.

22    Q.   Isn't it a fact that you and Officer Byrum were leading

23         this conversation and hoping that your suspicions might

24         somehow prove to come up with something?

25              MS. BARGUIARENA:  Your Honor, I'm going to

                                                          121

                                                      222

1    object.  This goes beyond the scope of voluntariness.

2                    THE COURT:  Excuse me.  I will go ahead and

3    I will sustain it, Counsel.  Let's move along, please,

4    or we are not going to finish with this darn hearing

5    today.  We are going to start with the evidence

6    tomorrow morning at 9 o'clock.  If you want to get to

7    the meat in this case, let's get to the meat and let's

8    move along, Counsel.

9                    MR. BARNARD:  Your Honor, I think on behalf

10   of my client --

11                   THE COURT:  Okay.  I will sustain the

12   objection.  Move along.

13                   MR. BARNARD:  I understand.

14                   THE COURT:  Thank you.  You heard my

15   ruling.

16   Q.   (By Mr. Barnard) Officer Araiza, at the time you sought

17   your search warrant and prepared your affidavit, you

18   had no reason to know whether or not Augustin Pena or

19   Juanita Torres were furnishing you with true, reliable

20   information, did you?

21   A.   Well, it was -- everything seemed to corroborate with

22   what we were suspecting them of.

23                   MR. BARNARD:  No further questions.

24                   MS. BARGUIARENA:  Nothing from the witness,

25   your Honor.

                                                        122

                                                   223

## EXHIBIT "D"

**TESTIMONY BY DETECTIVE NICOLAS ARAIZA FROM MOTION TO SUPPRESS IN 91-CR-1371-E & 91-CR-1521-E:**

Testimony proves improper conduct by the police was made to Defendant in order to obtian cooperation ( A confession).  Threats to illegally arrest Defendant's mother were made to Defendant to obtain cooperation (a confession).

**COERCION**

From: Vol. 1, "Transcripts" 91-CR-1521-E, pages 225-228.

1    Q.   Were they out of there, most of them out of their

2          vehicles?

3    A.   Yes, sir.

4    Q.   And they arrived soon approaching the house?

5    A.   Correct.

6    Q.   After telling Mr. Ashcraft of his rights, the Miranda

7          warnings, did you have any further discussion with him

8          before going into the house?

9    A.   I talked to him for a few minutes.

10   Q.   And the nature of your conversation was what?

11   A.   Was that we needed his cooperation to find the drugs

12         and the stolen property.

13   Q.   And he just immediately became cooperative and said

14         "let me take you and show you?"

15   A.   No, it wasn't immediately.

16   Q.   Okay.  Was there anything in the conversation to the

17         effect that "you'll either cooperate with us or we're

18         going to arrest your mother.  We may charge her with

19         possession of stolen property or we may charge her with

20         burglary of one or more residences?"

21   A.   No, no, it wasn't that.

22   Q.   Well, you did tell us, did you not, that you told Mr.

23         Ashcraft outside the house that his mother could become

24         accountable for what might be found in her house?

25   A.   Correct.

94

1    Q.   And wasn't it after that, after you told him that that

2          he began to become cooperative?

3    A.   Right.  He told us that he didn't want his mother to be

4          involved in what he had been doing.

5    Q.   Okay.  And so that's when Mr. Ashcraft became

6          cooperative?

7    A.   Correct.

8    Q.   Okay.  And did either you or Officer Vela or any of the

9          other officers to your knowledge, after going inside

10         the house, tell Mrs. Ashcraft or tell Mr. Ashcraft in

11         her presence that unless he cooperated that she or "Mr.

12         Ashcraft, your mother is going to be -- can be arrested

13         and be held accountable for this?"

14    A.   No.

15    Q.   Okay.  Then forget the arrest.  Be held accountable for

16         what might be found in this house?

17    A.   He was advised that she was responsible for the house.

18    Q.   She was?

19    A.   Yes, sir.

20    Q.   Okay.  And after that is when he began saying okay.

21         And he's handcuffed at this point in time, I assume?

22    A.   Correct.

23    Q.   Hands behind his back?

24    A.   Correct.

25    Q.   And I believe your testimony was that the search --

95

1      well, I believe it was the search took approximately

2      two hours, but maybe you said that you all were at the

3      scene for about two hours?

4   A.   Approximately.

5   Q.   Okay.  And during most of this time, was the search

6      being conducted?

7   A.   Yes, sir.

8   Q.   Did you all search the outbuildings, if any?

9   A.   We searched the whole property.

10  Q.   Okay.  You say Mr. Ashcraft took you and pointed, or

11     indicated with his face in his bedroom where you might

12     find some narcotics?

13  A.   He indicated by telling us where it was and pointed

14     with his face.

15  Q.   Were there anymore remarks made to he or to his mother

16     about her accountability for all the things that might

17     be found in her house or in this household?

18  A.   After we found the drugs we explained to him -- well, I

19     explained to him that we also suspected that he had

20     stolen property.  And that's when I advised him again

21     that his mother would be held accountable if he didn't

22     tell us where the stolen property was at.

23  Q.   Mr. Araiza, when you told him, "Mr. Ashcraft, your

24     mother can be held accountable for what we found or

25     what any stolen property might be here also," what in

                                                    96

1        truth and in fact were you suggesting?

2   A.   I was suggesting that if we found the property on our

3        own without his cooperation that meant that his mother

4        knew that he was hiding stolen property at the house.

5   Q.   Okay.  And to take that out to its very end, what you

6        were saying in effect was, "your mother can be charged

7        and arrested for this same property that's in her house

8        by mere possession," right?  Isn't that what you were

9        telling him without saying the word "arrest?"

10  A.   Well, we told him that she could be held accountable

11       for the stolen property.

12  Q.   Would you imagine that that's probably what went

13       through his mind --

14            MS. BARGUIARENA:  Your Honor --

15  Q.   (By Mr. Barnard) -- They are going to arrest my mother?

16            MS. BARGUIARENA:  I'm going to object.  It

17       would call for speculation on the part of this witness,

18       your Honor.  He's already asked him what he in fact

19       told the defendant about his mother.  He's already

20       stated twice, three times, what in fact was said.

21            MR. BARNARD:  Well, your Honor, what

22       Officer Araiza has told us indicates an opportunity to

23       cause a mental effect, an emotional reaction to the

24       words spoken which "your mother can be held

25       accountable."  And I'm submitting that the only

97

228

EXHIBIT "E"

TESTIMONY BY DETECTIVE NICOLAS ARAIZA: admitting that the word &
phrases (cooperate or your mother will be arrested" was a THREAT to
arrest Jon Ashcraft's mother if he did not cooperate") (Confess)
This was at the police station following the arrest and during the
interrogation of the Defendant following the Search and Arrest.


From: Vol. 1, "Transcript" 91-CR-1521-E, pages239 - 240.

1   Q.   Did you and Officer Byrum begin to catalog the

2        property, or did some other officer take care of that?

3   A.   I believe it was taken care of by somebody else.

4   Q.   So fairly shortly after that, you all sat down with him

5        and commenced your questioning him, I guess, and

6        discuss it?

7   A.   Right.

8   Q.   And again, I think you read him his statutory Miranda

9        warnings, Constitutional warnings?

10  A.   Yes, sir.

11  Q.   And during the time that you were taking his statement,

12       interrogating him, isn't it true that you again told

13       him, "If you don't continue to cooperate or if you

14       don't cooperate, anybody who is in charge of that house

15       can still be arrested, can be taken into custody?"

16  A.   No.  I didn't tell him that they would be taken into

17       custody.  I told him that they would be accountable for

18       anything.

19  Q.   When you are talking about heroin, stolen property,

20       which apparently is a result of burglary, what else

21       could you mean, accountable?

22  A.   Well, that they could be sent in for indictment on a

23       case.

24  Q.   Okay.  Is that not, therefore, a threat of criminal

25       prosecution, if you want to put it that way?

189

239

1    A.    Later prosecution.

2    Q.    Later.  But still the threat is there; is it not?

3    A.    Not imminent, just later on.

4    Q.    Well, you made those remarks to Jon Ashcraft more than

5          one occasion and as late as the time he was being

6          interrogated at the police station.

7    A.    I did tell him once while we were taking the statement.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

190

EXHIBIT "F"

**AFFIDAVIT BY HONORABLE GLEN BARNARD, PETITIONER'S TRIAL ATTORNEY:**

Certified Copy on file with Clerk of the Court of Cameron County, Texas in Cause No. 91-CR-1521-E.

(1)  Did not prepare,

(2)  Confirms that when he did prepare the end result was an acquital for Petitioner.

From: Vol. 1, "Transcripts" 91-CR-1521-E, page 206.

STATE OF TEXAS:

COUNTY OF CAMERON:


BEFORE ME, the undersigned authority, on this day, personally appeared Glen A. Barnard, a person known to me who stated as follows:

"My name is Glen A. Barnard. I am an Attorney at Law authorized to practice in the State of Texas. I was appointed by the Court on June 17, 1992 to be counsel for Jon Alan Ashcraft in Cause Number 91-CR-1521-E in the 357th Judicial District Court of Cameron County, Texas.

On June 22, 1992, I appeared in Open Court in the 357th Judicial District Court of Cameron County, Texas and requested a Continuance in accordance to Art. 1.051(e) (West Suppliment 1992) so that I may have adequate time to prepare for Mr. Ashcraft's defense. Judge Rogel Valdez denied my Motion for Continuance and we went on to pick a jury that day. The following day, June 23, 1992, we went on with the trial On June 24, 1992, the jury found Mr. Ashcraft guilty.

Neither myself nor Mr. Ashcraft ever waived the 10 (ten) days provided in Art. 1.051(e). That in fact I requested the time provide by law and by the Judge denying that request harmed and prejudiced Mr. Ashcraft's defense in a number of ways. One of the reasons Mr. Ashcr: was harmed was a key witness, Andres Garcia Hernandez, who was in custody of the Texas Department of Corrections, was not bench warrant back to Cameron County, Texas. Due to the fact that I did not have adequate time to have Mr. Hernandez bench warranted back to Brownsvill Texas, Mr. Ashcraft's defense was harmed substantially. This would be in violation of Mr. Ashcraft's Sixth Amendment right as radified b the Fourteenth Amendment "to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defense."

It is my belief that if I had been provided adequate time to obtain Mr. Ashcraft's witness and to prepare better, that the outcome of Mr. Ashcraft's trial would have been an acquital. Proof of this would be that I defended Mr. Ashcraft in a very similar Cause Number 91-CR-1524-E which resulted in an acquital. At this trial in December 1992, Mr. Hernandez did testify and I had enough time to prepare.

For the reasons stated above, I feel it would be appropriate for the Court to give Mr. Ashcraft a reversal and provide him with a new trial.

SIGNED this 26 day of March, 1993.

_____
Glen A. Barnard


SUBSCRIBED AND SWORN TO BEFORE ME THIS THE 26th DAY OF MARCH, 1993.

_____     206
NOTARY PUBLIC, STATE OF TEXAS